2014-92 Southern Iowa White Communications et al. v. Synergies3 Tec Services et al. May it please the court. My name is Bill Graham and I represent the plaintiffs. Let me get you pinned Mr. Graham. Okay, very good. Thank you, your honor. My name is Bill Graham. I represent the plaintiffs and appellants, White Communications LLC and Jeffrey White. Mr. White is a 30% owner of White Communications. The record reflects that the remaining shares of that company are owned by others, primarily by his mother. Counsel, that brings up an important question for me and that is, did Shirley and Jack White still own 70% of White Communications LLC at the time of the October 2016 operating agreement when that was signed? The reason I'm hesitating, your honor, the answer is yes, certainly, as to both of them. What I was struggling with was when Jack died and he did die during the pendency of these matters, but it was after that. So yes, your honor. Well, my follow-up question is this, was White Communications LLC a party to the operating agreement in October 2016? No, your honor. And so if they're not, how could the operating agreement make the assignment and assumption agreement obsolete? I agree that it can't. It is our position that it could not do that. It seems to me that there's a divergence in interest here between the LLC and Mr. White that is a very glaring conflict of interest. Was that addressed in the district court? Not as a conflict of interest, your honor, at least not to my recollection, but certainly the fact of the arguably competing interests, at least with respect to damages, was addressed for our part by the plaintiffs. We told the jury and acknowledged throughout that in the event of duplicative or duplicate damage awards between the two clients, we recognized we weren't entitled to double damages and the jury was told that the court would take care of that problem if it were a problem. My concern, counsel, is that the brief seems to take contradicting positions that would prejudice White Communications LLC. On the one hand, Jeffrey White acknowledges that Synergies did not owe four and a half percent to both the LLC and to him personally, and yet it argues that the removal of him for membership cost him four and a half percent under the operating agreement, and yet simultaneously argues in the reply brief on page 27 that the operating agreement did not supersede the assignment and assumption agreement. That's all true, your honor, and I don't view that as anything more than a situation, which we have often in tort cases involving multiple plaintiffs, where there is the potential for an award of duplicate damages, and we've, as I say, recognized from the outset that in the event of such awards, the court would be in a position to adjust that award. But my concern is that opposing counsel takes advantage of that in their brief to argue that, well, the jury maybe didn't award very much to the LLC because they thought that the operating agreement made the assumption agreement void and ineffective and therefore gave the assumption. You're absolutely right, your honor, that they did it. They didn't make that argument. I don't think that that has, frankly, so much to do with a conflict in the two positions as it does with just a faulty argument on their part that a contract to which White Communications was not a party could somehow supersede one to which it was a party, a position which, your honor, knows we reject. But if it was not superseded, then how does Jeffrey White have 4.5% coming to him instead of the LLC? He testified, your honor, that those, that his, my recollection is that he testified that the receipt by him of 4.5% of revenues going forward was a placeholder for White Communications and its entitlement. And he was up front with the jury about that. So if the, so we were left in the position, your honor, and the record is in the position that there is a written contract, as your honor knows, specifically laying out Jeffrey White's entitlement. The recovery by White Communications is not based upon a written agreement. There was none. And in fact, as the jury found, it's based upon an implied contract. The, if I may, I will move then to the, to a discussion first of Jeffrey White's position on this appeal, which is that the court should have granted his motion for judgment as a matter of law, both as made at the close of evidence and also after the jury verdict. Pardon me. And the premise of that is that there was simply no evidence, frankly, not just an insufficiency of evidence, but no evidence that shows that the elements necessary to show a four cause removal under the operating agreement had been met. This, of course, is not an employment case. It's a contract case. And it's one in which the contract specifically defines the term four cause. And, and that of course was instructed by the jury as well. The burden of proof was on the defendants to show that the four cause basis for removal of Mr. White from his company or from their company was supported by a showing of, showing that he had caused immediate or deferred economic or irreparable economic or reputational harm to the LLC or its business. There was simply no evidence of any of that. Even the hearsay evidence to which we object did not, did not, would not, even if it had been admissible, properly admissible, establish such evidence. Counsel, assume that the hearsay is admissible. We know here that the president of AT&T was made aware of this. And we know that they had a zero tolerance policy. Isn't it a reasonable inference the jury can make that that affected your client's reputation or I'm sorry, the defendant's reputation at that point? Isn't that something that the jury can make that leap? I don't, I don't think so, your honor. Not, not without Moore and the Moore wasn't there. The fact is that, that I think that's particularly true given that the, the misconduct by, by Jeffrey White was made in his role as a, as a representative of white communications and not in his role with synergies. So it was derivative concern at best on the part of AT&T. And of course, of course, AT&T didn't testify to any of that because they weren't brought in to testify. And so, and so there was no evidence that AT&T even actually had that concern. And to say that there is a zero tolerance policy seems to me does not, is not the same as saying your reputation has now been irreparably harmed. And, and there's quite, quite different matters. I think some, somebody or something can be guilty of something for which there is zero tolerance without that necessarily resulting in irreparable reputational harm, particularly to an unrelated or a separate entity such as synergies. So counsel, what, what would have been necessary there for AT&T to come in and say, hey, this damaged their reputation and I'll never forgive them for it? Is that, is that basically what, what you have to have for irreparable reputational damage? Clearly that would have, clearly that would have, would have helped their case. I don't think it would have to be quite that, quite that direct, but as in all cases involving reputation, there would be, there would need to be evidence showing here was the reputation, here it is after the fact. This change, which presumably would be a negative change, cannot be fixed. It cannot, your reputation cannot be repaired. And yes, they would need either testimony directly from AT&T or facts, which, which strongly gave rise to that, to that inference. None of that was there. And in fact, as we point out in the brief, our, the defendants themselves acknowledged that they knew of nobody, knew of nobody who thought less of synergies because of what Mr. White had done. Now that's a, that's, in my view, an outright admission that there was not reputation, irreparable reputation damage. Counsel, as Judge Loken, I thought, I thought the evidence was pointed more toward the economic harm or at least as much toward economic harm with the downturn in business and so forth. Then that, that, that doesn't have to be irreparable and unforgivable. That just has to be economic harm. I don't think so, your honor, respectfully. The, the, the, any economic, economic harm certainly. Apparently the jury did. I mean, this is not a question of law, what those, what those words mean. Your honor, the, the economic harm, which is certainly a second, a separate prong of the four cause removal definition still had to be irreparable. Both, both types of harm had to be irreparable. With respect to economic harm, there was similarly no evidence. The defendants... Let me just stop you there. What's a company that did poorly in 2020? ExxonMobil. Is that harm not, not irreparable because they'll, if the oil market turns around, they'll, they'll, they'll recover. What does irreparable economic harm mean when you have a severe downturn or a substantial downturn in business, but you're not dead? Well, I think in the, in the record in this case, a number of witnesses, including the defendants, were asked what they understood irreparable to mean. And they answered that it means they can't fix it. Now... Can you fix it when you have an operating loss for a substantial period of time? How do you fix that? There was no evidence of an business, lost revenues. I don't, I didn't just lost revenues. The, the, I, I don't concede that, that, that, that, that is not reparable depending on the amounts. Probably more importantly, Your Honor, there was, there was no evidence of causation. The, the defendants point to that loss of territories, but they, but they also acknowledged that they did not know whether that was caused by something Mr. White did. It happened nine months later. And, and it, and it was no evidence presented that it was, it was caused by, by this text message or something that Mr. White did. And so I think regardless of whether it could be considered irreparable, the causation element is not there, Your Honor. Given the fact, as we view it, that no evidence, I see if I'm reading the clock right, that I've already well impinged into my rebuttal time. And I would like to reserve some time for that. Thank you, Your Honor. My name is Haley Hermanson. I represent the appellees, Sarah G3, Tax Services, LLC, Eric Ashley, and Benton Odom Jr. I, I'd like to, do you agree that the economic harm had to be irreparable to, under the terms of the agreement, or is irreparable only apply to reputational? I believe that at trial it was, it was inferred that irreparable applied to both the economic and the reputational harm. Well, going back a little to Judge Loken's question, I mean, what does irreparable harm mean in this context? Irreparable, is there a difference between irreparable harm and the notion of irreparable damages? Because in Iowa law, irreparable damages, I mean, economic loss is rarely an irreparable damage. So is there a distinction here when we're talking about irreparable harm? And what, what is the meaning of that term as it's in the agreement? I believe that it would be a subjective standard, being that it was a vote of four or five members. You would ask, what did the four voting members think? Is that in the contract? In other words, is it that the four voting members have a reasonable belief that their business has suffered irreparable harm? I don't recall that's what it said. And I guess what I'm, looking for is where do I go to define that term? Counsel, your opposing counsel suggests we go to background Iowa common law. And I'm wondering if we don't do that, where do we go? Are you specifically referring to irreparable or reputational? Let's talk about irreparable economic harm at this point. But I think the question applies to both. Um, sure. Well, I think that a vote of four or five members necessarily implies a subjective standard. You'd have to ask what the four voting members thought as of the date of removal. And all four testified that they felt that following their investigation, they had no choice but to remove Mr. White if they were to save their business. Would the court then apply a reasonableness test to that? Otherwise, essentially, four members could expel the fifth without cause as long as they subjectively think he should be out, right? Or am I am I misstating that? Um, I guess a reasonable basis would would be sufficient. Yeah, I think a common sense meaning of the word would be appropriate. And I guess my problem is that's not in the contract. Sure, but neither is the actual harm standard that Mr. Graham is advocated for. And it's really just did the business suffer immediate or deferred irreparable reputational or economic harm to Synergy's or its business? And I think that you would need to include deferred in there to allow the members to act in a way that could prevent or mitigate the harm if possible. Counsel, let me ask you this question. Was the LLC a party to the agreement under which the terms of foreclosure removal were agreed to? Um, so the operating agreement was signed by the five individual members of Synergy's. So it was it was the governing document of the LLC. So would you agree that an LLC is a legally distinct entity from Mr. White? Yes. And so could Synergy's have removed Jeffrey White for cause without disturbing the role of the LLC? So I think that you were right when you were pointing out the conflicting interests of the plaintiffs. I think that ultimately what the jury could reasonably infer was that Jeffrey White took the four and a half percent for himself. And it really was a conflict of interest because the White communications claim was probably probably against Jeffrey White rather than Synergy's for taking that four and a half percent for himself. And Counsel, I'm not blaming you for any of the arguments you've made. I'm just wondering if the LLC wasn't hopelessly prejudiced here by the failure to recognize the conflict of interest. Do you mean White Communications, Your Honor? Yes. I think that perhaps the conflicting interest between Jeffrey White and White Communications may have acted to the LLC's detriment, but that was the way that they chose to proceed at trial. I'd like to, if I can, turn to the sufficiency of the evidence because I think that it's very important to note that all of plaintiff's arguments on appeal related to Jeffrey White's claim presuppose that he met his burden of proof. He just skips over whether or not he met every element required for his breach of contract claim and goes straight to the issue of whether Synergy's met its burden on the affirmative defense. However, if you look at verdict number four, which is on page 179, you'll see that the jury simply found in favor of Synergy's three. We don't know whether they ever even reached the issue of four cause removal. In fact, they could have just as easily concluded that Jeffrey White failed. Say that again. Wait, I didn't understand. Was verdict number four said what? Verdict number four was Jeffrey White's claim for breach of the operating agreement and it just, the jury just simply found in favor of Synergy's. So we don't know. So they, so they, if, if the contract was ambiguous with respect to irreparable, the district court, the district court sent it to, sent it to the fact finder who implicitly made its determination. Sure. I assume Iowa law is like most every other state on that, in that regard. If a contract is unambiguous, it's an issue for the court. If it's ambiguous, you need a fact finder to sort out the ambiguity. Was it charged that way or not? Ignored in the instructions. The instructions, instruction number six required Jeffrey White to prove the existence of the contract consideration, the terms of the contract, that he did what the contract required of him, that Synergy's three failed to him, failed to pay him the amounts owed or removed him and damages. Mr. White presents no real argument on appeal or does not particulate precisely how he supposedly met his burden as each of these elements. And we dispute that he did. And we believe that the jury could have easily concluded that Jeffrey White did not meet his burden and found four synergies on that basis, in which case they wouldn't even have reached the issue of the affirmative defense of the four cause removal. Specifically, Jeffrey White, the jury could have found that Jeffrey White failed to prove by preponderance of the evidence that he did what the contract required and that he had been damaged in any amount. On page 164 of Appellate's Appendix, you'll see that the operating agreement required its members to devote its best time and efforts to furthering the business and financial rules of the LLC. The jury could have found that Mr. White failed to meet his burden of proof on that element. Additionally, the operating agreement provided that Jeffrey White was entitled to a one-time payment of $250,000 following his removal, yet it was undisputed at trial that he received sums totaling $1.75 million after his removal. So the jury could have found that he was not damaged in any amount. And if Jeffrey White failed to meet his burden of proof on any one of these elements, then the jury would not have needed to reach the issue of the affirmative defense. I'll turn now to some of the evidentiary rulings that Mr. Graham referenced. Specifically, he mentioned hearsay with respect to exhibits G and H. I would note that plaintiffs did not raise the issue of the business record exceptions in their post-trial briefings. They only argued that the certain stated non-hearsay purposes were, in fact, actually offered for their truth. They did not identify which specific statements they took issue with, and so the court analyzed the issue with respect to exhibits G and H. But we don't believe that the business records argument was preserved for appeal or at the very minimum it was waived. There was no confusion over the court's rulings. They were two very distinct rulings. Exhibits G and H were admitted in their entirety under the business records exception, and Roger Hope's testimony with respect to exhibits G and H was admitted for the stated non-hearsay purpose of the impact that it had on voting members. With respect to the economic and reputational harm, I would also like to note that it is disjunctive in the operating agreement, meaning a finding in favor of serendipity on either would have sufficed had the jury reached the issue of poor cause removal. And as you pointed out, the simple fact of receiving that email from the office of the president with that vulgar text message attached, I think we can all agree would be damaging to the reputation of a business. And likewise, the loss of territories, specifically territories in which white communications had operated prior to the merger, is economic harm, and it's a reasonable inference that the jury could draw that, you know, shortly after the text, the specific territories tied to Jeff White were lost. Council, what about the argument that, again, reputational harm here, I don't think is defined in the agreement. And opposing counsel suggests that we should look to Iowa law again, and in this case, Iowa defamation law, which requires some evidence of, in this case, it would be pre-breach reputation in order to establish that there's actual reputational harm. Why don't we do that when we have an undefined term? Sure, and again, I think you would look at the common sense meaning of the word. If you go to even Iowa standard jury instructions on defamation, reputational harm is not defined. And as far as evidence of reputation prior to and after the text message at issue, in defamation cases, reputation, evidence of reputation prior to the alleged defamation is relevant in showing the measure of damages or, you know, the negation of damages. We didn't seek damages from Jeff White. This was an affirmative defense to his breach of contract claim. And the common law decisions geared to protecting a person's interest in his or her own name is just, it's not the proper measure for an affirmative defense on a breach of contract claim. Synergies was, you know, not required to prove publication of a statement concerning synergies. So I don't think that reputational harm should be defined by common or by common law defamation standards. And regarding Roger Hope's testimony on the zero tolerance policy that you had mentioned, his testimony was during his time when he was handling customer relations and he had seen companies terminated for contravening the zero tolerance policy, which prohibited any sort of unprofessional conduct by its employees or I think in some, I'd like to say that the system here worked as the law contemplates. The issues in this case were decided on their merits by a jury following four days of trial. Synergies spent, or excuse me, plaintiffs spent much of their case in chief trying to disprove that any harm had come to synergies rather than proving up their breach of contract claim. Even if they had reached the issue of four cause removal, however, synergies presented sufficient evidence showing that its four voting members reasonably believed that it had suffered or would suffer irreparable economic or reputational harm as a result of Mr. White's text and that his actions warranted four cause removal. And because sufficient evidence properly admitted at trial supported the jury's findings, the district court's refusal to overturn the verdict was proper. And we ask this court to affirm. Counsel, on the implied contract damages argument, your brief didn't respond to the argument that district court aired by quoting the Scott case on the standard when the jury verdict charged a different standard. Was it aired to rely on Scott or not? Um, I don't believe so. The proper measure of damages for a breach of implied contract claim is the reasonable value of the goods and services, and there was simply no evidence presented at trial as to what the value of the services and the text and equipment that white communications gave to synergies was. In fact, when Mr. White asked about it, when Mr. White was asked about it, he just referenced the initial $400,000 payment. And I see my time has expired, unless there are any further questions. Very good. Thank you. Mr. Graham for rebuttal. You're muted, counsel. There we go. Oftentimes judges like it if I'm muted, but thank you, Your Honor. Thank you for alerting me to that. On this latter point of the question of how the law should be measured on the implied contract, our view is simply this, that that's determined by the instructions and the verdict form, and there was no challenge to that. Well, but no, I think there's another aspect to this because the opposing counsel notes that in came after the instructions, your client, trial counsel agreed it must award the amount requested if reasonable, or must be based on the evidence presented. That trumps anything to the contrary in the verdict form, doesn't it? Well, it wasn't intended to, and speaking as that counsel, I can tell you that what we were recognizing is the fact that any decision by the jury has to be based upon the evidence. That does not mean we're saying you can now ignore the instructions, and we did not say that, Your Honor. Well, I know, but this notion that it can't be Scott because Scott didn't focus, didn't use the same language as the jury instruction is highly technical. And it seems to me if there was then a further question from the jury on this issue and clarification by the trial court, that's all we have to look at. That's the point. I take your point, Your Honor. I respectfully don't agree that that was the intent of either the court's response to the question or of counsel's for that matter. If I may also address briefly in my next 43 seconds, there's been a suggestion, a strong suggestion now by counsel that somehow our position on appeals undermined because the jury could have found that Mr. White didn't prove his side of the contract breach claim. First of all, that doesn't change the defective nature of the evidence on the affirmative defense that they had to prove, but more importantly perhaps, there was no dispute at all in this case on any of the other issues. The record is before the court and has been briefed by the parties that the other elements of the contract were overwhelmingly established and nobody ever claimed that they weren't. And so it really did, the entire case on this point for Mr. White was decided and determined, tried on the question of the four cause removal language, which we do not believe would be a by the owners, but rather determined by the evidence of whether the damage had occurred, which we think was deficient. Thank you. Unless there are further questions, my time has expired.